

**FILED**

Mar 19 2015, 9:54 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Joe Keith Lewis<br>Marion, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Jodi Kathryn Stein<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cody Rutledge,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 19, 2015<br><br>Court of Appeals Case No.<br>85A04-1407-CR-330<br><br>Appeal from the Wabash Superior<br>Court<br><br>The Honorable Christopher M. Goff,<br>Judge<br><br>Cause No. 85D01-1307-FD-501 |

**Brown, Judge.**

[1] Cody Rutledge appeals his convictions for operating a vehicle while intoxicated as a class D felony and driving while suspended as a class A misdemeanor and his status as an habitual substance offender. Rutledge raises two issues which we consolidate and restate as whether the trial court abused its discretion by admitting certain evidence. We affirm.

## *Facts and Procedural History*

[2] Around midnight or in the early morning hours of July 6, 2013, Wabash County Sheriff's Deputy Dustin Hurst was driving on patrol with Reserve Deputy David Brinson and on his way to Lagro, Indiana. Deputy Hurst encountered a maroon minivan and observed that it "appeared that the driver was having a hard time keeping the vehicle on the roadway," "it appeared as it would approach the edge of the roadway, it would jerk back, multiple times . . . um, trying to stay on the road," and the driver jerked the wheel and it "wasn't just from bumps."[1] Transcript at 24, 49. Reserve Deputy Brinson observed the minivan "would drift off the road, come back on the road." *Id.* at 54. Deputy Hurst followed the minivan until it pulled into a residential driveway. He drove by the minivan, read the license plate number, continued to a parking lot, and entered the license plate number into his computer to determine if the minivan "belonged there," which took a few seconds. *Id.* at 25. The address related to

---

[1] When asked by defense counsel whether the minivan actually went off the roadway, Deputy Hurst stated: "I don't believe so but I don't recall for sure. I know, I know it was getting very close. I do remember at one point some dust flying up from the edge of the road but that doesn't necessarily mean it was off the road." Transcript at 30. Deputy Hurst also testified that the actions of the driver were not enough to pull the vehicle over for erratic driving.

the license plate was in La Fontaine, and Deputy Hurst determined that the residence where the minivan was located was not in La Fontaine. Deputy Hurst started back and observed that the minivan had already backed out and was starting onto the road again "[s]o, it stayed a very short . . . time there and it continued east from there." *Id.* at 26.

[3] Deputy Hurst turned around and saw that the minivan entered the Main Street of Lagro, went through a stop sign, traveled approximately two blocks, and then pulled into another residence. Deputy Hurst continued by to a street, turned around, and returned to the location of the minivan which took about ten to thirty seconds.[2] During this time, he did not observe anybody around the minivan, any dome light illuminate, or any door open. Reserve Deputy Brinson did not observe any other vehicles, anything happening around the minivan, or any dome light illuminate.

[4] Deputy Hurst approached the minivan with his vehicle facing the driver's side of Rutledge's minivan and pulled up perpendicular to it. He could not initially tell with his headlights if anyone was sitting in the minivan and did not activate his red and blue lights. He later testified that he was "just going up to check on

---

[2] On cross-examination, Rutledge's trial counsel discussed Deputy Hurst's u-turn and asked him: "You estimated you think you were, uh, about ten to fifteen seconds to do all of that?" Transcript at 47. Deputy Hurst answered: "That's correct, sir." *Id.* Rutledge's trial counsel stated: "It could have been longer than that. It could have been twenty to thirty seconds." *Id.* Deputy Hurst stated: "I suppose it could have." *Id.*

the driver and kind of see if they belonged where they were at. What was going on." *Id.* at 29.

[5] Deputy Hurst exited his vehicle, walked up to the driver's side of the minivan, and observed Rutledge sitting in the driver's seat "lying side wise over the . . . center console of the vehicle with his head resting on the passenger seat." *Id.* at 37. Reserve Deputy Brinson also exited Deputy Hurst's vehicle and went to the back corner of the minivan. Deputy Hurst tapped on the driver's side window, Rutledge sat up, and they had a brief discussion before Rutledge exited the vehicle. Either Rutledge or Deputy Hurst opened the door so they could communicate.[3] Deputy Hurst asked Rutledge what was going on, and Rutledge said that he had been asleep and did not know what was going on. Deputy Hurst noticed an odor of an alcoholic beverage, that Rutledge's eyes were red and glassy, that his speech was slightly slurred, and observed an open alcohol container in the driver's side of the console. At one point during the conversation, Rutledge said that the keys were not in the ignition, and Deputy Hurst located the keys on the passenger side floor.

[6] Deputy Hurst asked Rutledge to step out of the vehicle. Rutledge completed a partial field sobriety test but then stated that he did not want to participate in any more such tests. Specifically, Deputy Hurst completed "about two-thirds of the way through the horizontal gaze nystagmus test" before Rutledge advised

---

[3] Deputy Hurst testified that Rutledge sat up "and I believe either he or I, one opened the door, all so I could speak with him." Transcript at 37.

that he did not wish to participate any further. *Id.* at 38. Rutledge said that he was not operating the vehicle, that a friend had driven him to Lagro, and that the friend had left. Deputy Hurst stated that he did not see the dome light illuminate, and Rutledge said that maybe someone climbed out the window.[4] Deputy Hurst asked Rutledge if he had a driver's license, and Rutledge indicated that he did not.

Deputy Hurst offered Rutledge a certified chemical test and gave him the implied consent warning, and Rutledge refused to take the test. Deputy Hurst transported Rutledge to the Sheriff's Department and obtained a search warrant for a blood draw. The blood was later determined to contain .19 grams of alcohol per hundred milliliters of blood.

On July 8, 2013, the State charged Rutledge with operating a vehicle while intoxicated as a class D felony and driving while suspended as a class A misdemeanor. On November 20, 2013, the State alleged that Rutledge was an habitual substance offender. On February 11, 2014, the State charged Rutledge with operating a vehicle with .15 grams of alcohol as a class A misdemeanor.

On June 17 and 18, 2014, the court held a jury trial and the first phase addressed the charges of driving while suspended as a class A infraction,

---

[4] Rutledge testified that when Deputy Hurst said that he did not see the dome light come on, he told him that he did not "really have an answer for that" and that "I did mention somebody jumping out the window because I thought he was kind of being smart mouth with me so I thought I'd give it right back to him but, you know, I, I didn't know what to tell him." Transcript at 115.

operating a vehicle while intoxicated as a class C misdemeanor, and operating a vehicle with .15 grams of alcohol as a class A misdemeanor. Deputy Hurst testified regarding his observations of the minivan before actually approaching the vehicle, and defense counsel raised an objection to any testimony or evidence based upon the traffic stop. Defense counsel objected on the basis of the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution and argued that there was no reason for the traffic stop as Deputy Hurst observed no improper driving. Defense counsel also argued that "I don't believe you can establish a reasonable stop on the grounds that a vehicle is not from the locale, location . . . that it's observed at." *Id.* at 32.

[10] The prosecutor asked Deputy Hurst if he actually stopped the minivan, and Deputy Hurst said that he did not. He testified that his reason for approaching the minivan was that "it seemed to [him] that every time the police car would get behind his vehicle, it would pull into a residence in an attempt to kind of elude me" and "basically just to speak with the driver and see what, you know, kind of what they were up to." *Id.* at 33. The prosecutor argued that there was not a stop and that Deputy Hurst had "a reason to investigate what's going on with this car or this driver, uh, to see if something's wrong or . . . what is happening." *Id.* at 34. Defense counsel argued that there was no need of assistance and that the idea that the person in the minivan was attempting to elude Deputy Hurst was not a basis for a traffic stop or a *Terry* style investigation. *Id.* at 34.

[11]     The court stated:

> [I]t's kind of a unique fact pattern that's before me I think largely because, um, of, of the state that Mr. Rutledge was in when he was encountered by Deputy Hurst, uh, in, in that it may have been a consensual encounter, an encounter but for the fact that he's, uh, asleep. Um, I think that's evidence that's going to be presented. Uh, if, if it's not a consensual encounter, I think that it has to be, you know, the, the investigatory, um, stop. Is it really a stop? I don't know that it's [sic] movement was impeded in any fashion. I don't know based on the evidence before me that he was restricted in anyway from moving or leaving the scene. Again, uh, he was apparently unconscious. But if I look in, um, in, with an eye towards seeing whether or not if it was an investigatory stop, whether or not the totality of the circumstances, um, makes it, uh, arises to reasonable suspicion that criminal activity was afoot. I, I think that it was. I, I think that there was, uh, reasonable suspicion, uh, that criminal activity was afoot based on the totality of the circumstances which would include the, the time of day, the, uh, behavior, the fact, uh, that he's pulling in to a variety of, um, or at least two different driveways during this time period. Uh, the Officer testified that he thought that that was peculiar, he thought that he was eluding him and based on the totality of the circumstances, I think that it was, um, that does arise to reasonable suspicion. Again, I'm not sure, however, that we even get to that point because, uh, [Rutledge] was apparently, uh, not awake and so, uh, if he had been, uh, it might have been a consensual encounter. So, I, I, I'm also a bit troubled by the fact that I don't know if there's enough evidence before me to find that he was impeded in anyway so that it was a stop. I think the closest thing is the investigatory stop. So, I think if it arises to that level, there was reasonable suspicion. So, I would, uh, for those reasons and all other reasons supported by the record, overrule the objection.

*Id.* at 35-36. Defense counsel then asked that the court show that his objection constitute a continuing objection, and the court granted the request.

[12] Rutledge and his brother testified that Rutledge's brother drove him to the location where Deputy Hurst encountered him, threw the car keys on the floorboard, and walked away. The jury found Rutledge guilty as charged. After Rutledge pled guilty to the operating while intoxicated and driving while suspended enhancements, the jury determined that Rutledge was an habitual substance offender.

[13] On July 1, 2014, the court sentenced him to one and one-half years with all but thirty-six days suspended and the balance served on probation for operating while intoxicated as a class D felony, enhanced by three years due to the habitual substance offender determination.[5] The court sentenced Rutledge to a concurrent thirty-six days for driving while suspended as a class A misdemeanor.

## *Discussion*

[14] The issue is whether the trial court abused its discretion by admitting evidence obtained after Deputy Hurst and Reserve Deputy Brinson approached Rutledge's vehicle. Our review of rulings for the admissibility of evidence is essentially the same regardless of whether the challenge is made through a pretrial motion to suppress or by trial objection. *Bean v. State*, 973 N.E.2d 35, 39 (Ind. Ct. App. 2012) (citing *Jackson v. State*, 890 N.E.2d 11, 15 (Ind. Ct. App. 2008)), *trans. denied*. Generally, the admission and exclusion of evidence falls

---

[5] The abstract of judgment indicates that one year and 144 days were suspended to probation.

within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). We review a trial court's denial of a defendant's motion to suppress deferentially, construing conflicting evidence in the light most favorable to the ruling, but we will also consider any substantial and uncontested evidence favorable to the defendant. *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). We defer to the trial court's findings of fact unless they are clearly erroneous, and we will not reweigh the evidence. *Id.* When the trial court's denial of a defendant's motion to suppress concerns the constitutionality of a search or seizure, however, it presents a question of law, and we address that question *de novo*. *Id.*

[15] Rutledge argues that the encounter between Deputy Hurst and himself was a seizure under the Fourth Amendment and Deputy Hurst's actions were unreasonable under Article 1, Section 11 of the Indiana Constitution. The State argues that the encounter was consensual, that reasonable suspicion supported the deputies' approach of Rutledge, and that their conduct was reasonable under the Indiana Constitution. We address Rutledge's arguments under the federal and state constitutions separately.

A. *The Fourth Amendment*

[16] Rutledge asserts that the encounter constituted a seizure and not a consensual encounter. He posits that a number of facts establish that a reasonable person would be intimidated, including that it was late at night with no one else around, Deputy Hurst made a concerted effort to follow him and pulled his vehicle up to the minivan with his headlights shining on the driver's door, Deputy Brinson positioned himself behind the minivan effectively blocking it, Rutledge was awakened by Deputy Hurst tapping at the window and did not see Deputy Hurst walk up or observe his demeanor, and the minivan door was either opened by Deputy Hurst, "commanding Rutledge to exit" or by Rutledge "suggesting submission and an acknowledgement that he was not going to be allowed to leave." Appellant's Brief at 12. Rutledge also asserts that Deputy Hurst did not have reasonable suspicion that criminal activity was afoot.

[17] The State argues in part that the encounter did not implicate the Fourth Amendment because it was consensual. The State asserts that Rutledge does not make any allegation that the manner in which Deputy Hurst parked his vehicle physically impeded his freedom of movement in any way and that Rutledge offered no evidence that Deputy Hurst's use of language or tone of voice indicated that Rutledge's compliance might be compelled. The State also argues that the deputies had reasonable suspicion.

[18] The Fourth Amendment to the United States Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches

and seizures conducted without a warrant supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). Encounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do. *Id.* at 261. Consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. *Id.* Nonconsensual encounters do, though, and typically are viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop. *Id.* The former of these requires probable cause to be permissible; the latter requires a lower standard of reasonable suspicion. *Id.*

[19]  "Determining whether this was a consensual encounter or some level of detention 'turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business.'" *Id.* (quoting *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003)). "The test is objective—not whether the particular citizen actually felt free to leave, but 'whether the officer's words and actions would have conveyed that to a reasonable person.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547 (1991) (citing *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870 (1980))). Further, "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S. Ct. at 1551. Examples of facts and circumstances that might lead

a reasonable person to believe that he or she was no longer free to leave could include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Clark*, 994 N.E.2d at 261-262. What constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary depending upon the particular police conduct at issue and the setting in which the conduct occurs. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988). In *Powell v. State*, 912 N.E.2d 853, 860-862 (Ind. Ct. App. 2009), this court examined case law holding that law enforcement's approach to a parked vehicle does not in itself constitute an investigatory stop or seizure for purposes of the Fourth Amendment.

[20] Here, the record reveals that the vehicle in which Rutledge was seated was parked at a residence and the keys were on the passenger side floor. Deputy Hurst did not pull his vehicle directly behind Rutledge's vehicle. The following exchange occurred during cross-examination of Deputy Hurst:

> Q: You were not able to observe, uh, uh, anybody's, uh, head in the vehicle as you pulled up on it. Is that correct? In other words, . . .
> A: Correct.
> Q: There would have been not only tinted windows but there would have been head rests, etcetera. Correct?
> A: Uh, I didn't pull up behind the vehicle, sir.
> Q: So you never actually got up behind it.
> A: Not when I stopped my vehicle. I was behind it on the roadway but after I turned around, I pulled up perpendicular to the vehicle.

Transcript at 50. Deputy Hurst did not activate his red and blue lights. He observed Rutledge sitting in the driver's seat "lying side wise over the . . . center console of the vehicle with his head resting on the passenger seat." *Id.* at 37. Deputy Hurst tapped on the driver side window and attempted to speak with Rutledge, and eventually Rutledge sat up. To the extent Rutledge argues that the minivan door was either opened by Deputy Hurst, "commanding Rutledge to exit" or by Rutledge "suggesting submission and an acknowledgement that he was not going to be allowed to leave," Appellant's Brief at 12, we observe that Rutledge's trial counsel asked Reserve Deputy Brinson whether Deputy Hurst had to open the door to arouse Rutledge or just tap on the window, and Deputy Brinson answered: "He was tapping on the window." Transcript at 58. Deputy Brinson also testified that Deputy Hurst and Rutledge had a brief discussion before Rutledge exited the vehicle. As for Deputy Brinson's presence at the scene, we note that he went to the back corner of the minivan. Neither lights nor siren were activated, no weapons were pulled, nor did any touching of Rutledge occur. The deputies did not initiate a traffic stop and merely approached the car, and Rutledge's freedom of movement was not impaired.

[21] Given these facts, we cannot say that Deputy Hurst's approach to the parked vehicle in which Rutledge was an occupant and initial contact with Rutledge constituted an investigatory stop or a seizure under the Fourth Amendment. The record supports the conclusion that the initial encounter here was

consensual and thus fell outside the ambit of the Fourth Amendment's guarantee against unreasonable searches and seizures.

[22] However, even assuming that the initial encounter was not consensual and that a stop occurred when Deputy Hurst opened the door, we conclude that the facts known to Deputy Hurst together with the reasonable inferences would cause an ordinarily prudent person to believe that criminal activity has or is about to occur. Rutledge concedes that "he turned off the Lagro Road two times and let Hurst pass him twice," but argues that Deputy Hurst had only a hunch this was suspicious and observed no other activity or circumstance that would suggest criminal activity was afoot. Appellant's Brief at 18. He asserts that his actions are reminiscent of the actions of an individual who, upon observing police, turned away once or twice. The State notes that Deputy Hurst thought it was unusual that Rutledge would pull the minivan into two residences within a short period of time and appear to have no connection to either residence, and that his erratic driving and evasive actions strongly suggested an intoxicated driver who was evading the police. The State also argues that Rutledge's attempt to focus on only his evasive driving and analogizing that to an individual's right to turn away from police misses the mark because reasonable suspicion is based upon a totality of circumstances.

[23] In *Terry v. Ohio*, the United States Supreme Court established the standard for determining the constitutionality of investigatory stops. 392 U.S. 1, 88 S. Ct. 1868 (1968). The Court ruled that the police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based

on specific and articulable facts, the officer has a reasonable suspicion of criminal activity. *Id.* at 27, 88 S. Ct. at 1883; *see also Jackson v. State*, 669 N.E.2d 744, 747 (Ind. Ct. App. 1996) ("In *Terry*, the Supreme Court held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot' the officer may briefly stop the suspicious person and make 'reasonable inquiries' to confirm or dispel those suspicions.") (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884). "Reasonable suspicion exists where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." Baldwin, 715 N.E.2d at 337. *Campos v. State*, 885 N.E.2d 590, 597 (Ind. 2008) (quoting *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999)). In judging the reasonableness of investigatory stops, courts must strike "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement] officers." *Carter v. State*, 692 N.E.2d 464, 466 (Ind. Ct. App. 1997) (quoting *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 2640 (1979)). When balancing these competing interests in different factual contexts, a central concern is "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* (citing *Brown*, 443 U.S. at 51, 99 S. Ct. at 2640). Therefore, in order to pass constitutional muster, reasonable suspicion must be comprised of more than an officer's general "hunches" or unparticularized suspicions. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. However, *Terry* does not

require absolute certainty of illegal activity, but rather reasonable suspicion. *Robinson*, 5 N.E.3d at 368.

[24] Whether an investigatory stop is justified is determined on a case by case basis. *Williams v. State*, 745 N.E.2d 241, 245 (Ind. Ct. App. 2001). In making this determination, we consider the totality of the circumstances. *Id.* "Judicial interpretation of what constitutes 'reasonable suspicion' is fact-sensitive." *Bridgewater v. State*, 793 N.E.2d 1097, 1100 (Ind. Ct. App. 2003), *trans. denied*. Avoiding the police or turning away from them is not enough by itself to constitute reasonable suspicion. *Id.* The United States Supreme Court has noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) (citations omitted).

[25] The record reveals that: (1) the encounter occurred around midnight or in the early morning hours; (2) it appeared to Deputy Hurst that the driver of the minivan was having a hard time keeping the vehicle on the roadway and that he jerked the wheel back multiple times, Transcript at 49; (3) after Deputy Hurst began following Rutledge, Rutledge pulled into a residential driveway that did not match the address related to the license plate; (4) Rutledge stayed only a very short time before exiting the driveway; (5) Rutledge continued driving before pulling into a second driveway that was also not the address related to the license plate; (6) Deputy Hurst and Reserve Deputy Brinson did not observe

any other vehicles, anything happening around the minivan, or any dome light illuminate; and (7) Deputy Hurst observed Rutledge "lying side wise over the . . . center console of the vehicle with his head resting on the passenger seat." Transcript at 37. Under these circumstances, we conclude that the facts known to Deputy Hurst together with the reasonable inferences arising from such facts would cause an ordinarily prudent person to believe that criminal activity may be afoot, thus justifying an investigatory stop. The stop was not a violation of Rutledge's Fourth Amendment rights and therefore the trial court did not err in admitting evidence seized as a result of the encounter.

B. *Article 1, Section 11 of the Indiana Constitution*

Article 1, Section 11 of the Indiana Constitution provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure . . . ." Despite the fact that the text of Article 1, Section 11 is nearly identical to the Fourth Amendment, Indiana courts interpret and apply it "independently from federal Fourth Amendment jurisprudence." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). In conducting analysis under this provision, we focus on whether the officer's conduct "was reasonable in light of the totality of the circumstances." *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). In making this determination, we balance: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* When police conduct is challenged as violating Section

11, the burden is on the State to show that the search or seizure was reasonable under the totality of the circumstances. *State v. Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008), *reh'g denied*.

[27] Rutledge argues that Deputy Hurst's concern, suspicion or knowledge that a violation had occurred was *de minimis*, that Hoosiers should expect to be able to travel within their home county without drawing suspicion from local law enforcement, and that the needs of law enforcement were not significantly at play because the Town of Lagro had not been described as a hot spot for criminal activity.

[28] The State contends that the degree of concern, suspicion, or knowledge that Rutledge might have been driving impaired was reasonably high, that Deputy Hurst's intrusion on Rutledge's activities was minimal as he was unconscious in the van at the time, and law enforcement needs were reasonably high.

[29] The record reveals that Deputy Hurst encountered a maroon minivan around midnight or in the early morning hours and observed that it "appeared that the driver was having a hard time keeping the vehicle on the roadway," "it appeared as it would approach the edge of the roadway, it would jerk back, multiple times . . . um, trying to stay on the road," and the driver jerked the wheel and it "wasn't just from bumps." Transcript at 24, 49. The minivan pulled into one residential driveway, stayed a very short time, and drove to another residential driveway a relatively short distance away. Neither of the residences where Rutledge parked his vehicle were the address related to his

license plate. Deputy Hurst exited his vehicle, walked up to the driver's side of the minivan, and observed Rutledge sitting in the driver's seat "lying side wise over the . . . center console of the vehicle with his head resting on the passenger seat." *Id.* at 37. We conclude that the record indicates a degree of concern, suspicion, or knowledge that a violation had occurred.

[30] The record also reveals that the degree of intrusion was minor. Deputy Hurst parked his squad vehicle near Rutledge's vehicle but not behind it. He approached the driver's side of Rutledge's vehicle on foot while Deputy Brinson approached only the rear corner. Under these circumstances, we conclude that Deputy Hurst's approach and initial contact with Rutledge was minimally intrusive and did not violate Rutledge's rights against unreasonable search or seizure under Article 1, Section 11 of the Indiana Constitution. We further note that the Indiana Supreme Court has observed that few Hoosiers would dispute the heartbreaking effects of drunk driving in our state and that law enforcement has a strong interest in preventing crashes involving alcohol-impaired drivers. *See Robinson*, 5 N.E.3d at 368. The trial court did not abuse its discretion in overruling Rutledge's objection to the admission of evidence based upon Article 1, Section 11 of the Indiana Constitution.

## *Conclusion*

[31] We cannot say that the trial court abused its discretion in overruling Rutledge's objections, based upon the Fourth Amendment to the United States Constitution or Article 1, Section 11 of the Indiana Constitution, to the admission of evidence obtained after the encounter with Deputy Hurst.

For the foregoing reasons, we affirm Rutledge's convictions.

Affirmed.

Bailey, J., and Robb, J., concur.