## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 15 2020, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathan Meeks
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Barry Lee Cook,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 15, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2404<br><br>Appeal from the Grant Superior Court<br><br>The Honorable Dana J. Kenworthy, Judge<br><br>Trial Court Cause No.<br>27D02-1505-F2-4 |

**Pyle, Judge.**

# Statement of the Case

Barry Lee Cook ("Cook") was convicted of Level 2 felony dealing in a narcotic drug,[1] Level 2 felony dealing in cocaine,[2] Level 6 felony possession of a narcotic drug,[3] and Class A misdemeanor possession of marijuana.[4] Cook was also found to be an habitual offender.[5] On appeal, Cook argues that: (1) the trial court abused its discretion by admitting evidence obtained pursuant to the execution of a search warrant at a residence and during an investigative stop, maintaining that the search warrant lacked probable cause and that the investigative stop lacked reasonable suspicion; and (2) there was insufficient evidence to support his two Level 2 felony dealing convictions. Concluding that the trial court did not abuse its discretion and that there is sufficient evidence to support Cook's convictions, we affirm the trial court.

We affirm.

# Issues

1. Whether the trial court abused its discretion by admitting evidence.

---

[1] IND. CODE § 35-48-4-1.

[2] I.C. § 35-48-4-1.

[3] I.C. § 35-48-4-6.

[4] I.C. § 35-48-4-11.

[5] I.C. § 35-50-2-8.

2. Whether sufficient evidence supports Cook's two felony dealing convictions.

# Facts

[3] Late in the evening on May 1, 2015, the members of the Grant County Joint Enforcement Against Narcotics Team ("JEAN Team") surveilled a house at 120 West Sherman Street ("the House") after receiving a tip of illegal drug activity. Members of the JEAN Team observed two females, later identified as Casey Jones ("Jones") and Breanna Reynolds ("Reynolds"), mother and daughter, enter the House and leave approximately ten to fifteen minutes later.

[4] After Jones and Reynolds had left the House, the women were approached on the street by Marion Police Department Detective Sergeant Josh Zigler ("Detective Sergeant Zigler") and Detective Sergeant John Kauffman ("Detective Sergeant Kauffman"). Detective Sergeant Zigler, who had previously been certified as a drug recognition expert, assessed that both Jones and Reynolds "were on some sort of a narcotic analgesic . . . or heroin specifically[.]" (Tr. Vol. 4 at 174). Detective Sergeant Zigler observed a "fresh track mark with blood" on the arm of one of the women. (Tr. Vol. 4 at 174). Detective Sergeant Zigler also observed that the women were "lethargic and . . . slow to react" and experiencing the "high euphoria" associated with drugs. (Tr. Vol. 4 at 174). Additionally, both women had "very constricted pupils." (Tr. Vol. 4 at 174). During the conversation on the street, the women explained that they "had just used and got heroin from an individual inside the [House]." (Tr. Vol. 4 at 221). Jones and Reynolds were then transported to the Marion Police

Department and separately interviewed. Based on the information provided by Jones and Reynolds, Detective Sergeant Zigler began the process of obtaining a search warrant for the House.

[5] Meanwhile, Detective Sergeant Kauffman continued to surveil the House. Detective Sergeant Kauffman observed two males exit and get into a green Ford Explorer. One male entered the driver's seat, and the other male entered the passenger seat. Detective Sergeant Kauffman testified that he "did not know the driver, but . . . did recognize [that] the passenger[]" was "Barry Cook." (Tr. Vol. 4 at 222). Detective Sergeant Kauffman then requested that a patrol vehicle initiate a traffic stop of the Explorer. A patrol officer from the Marion Police Department initiated a traffic stop based on a "narcotics investigation[]" and detained the occupants. (Tr. Vol. 4 at 87). Detective Sergeant Kauffman, who was following the Explorer in an unmarked vehicle, confirmed that the passenger was Cook. The driver was identified as Barry Magers ("Magers"). According to Detective Sergeant Kauffman, Cook was detained "based on . . . statements provided from . . . Jones and . . . Reynolds and the fact [that] they had stated the heroin [was obtained] from a tall skinny dark complected [sic] black male. Mr. Cook fit those descriptions." (Tr. Vol. 4 at 224). Detective Sergeant Kauffman relayed this information to Detective Sergeant Zigler, who was still preparing the paperwork necessary for the search warrant.

[6] Around 1:00 a.m. on the morning of May 2, 2015, Detective Sargent Zigler arranged a telephone call between himself and Judge Jeffrey Todd ("Judge Todd") to obtain the search warrant. During the tape-recorded conversation,

which was also transcribed, Detective Sergeant Zigler testified under oath to the facts surrounding the JEAN Team's surveillance of the House and the drug transaction that had occurred therein. Judge Todd found probable cause and issued a search warrant seeking the following relevant items: pure or adulterated marijuana, heroin, any other illegal narcotic controlled substance, scales, U.S. cash currency, cell phones, smart phones and the data contained therein that related to drug activity for the dates of May 1 and 2, 2015, and mail. The search warrant also authorized a search of the Explorer, Cook, and Magers.

[7]     Execution of the search warrant at the House yielded many pieces of evidence including: a letter on a coffee table, which was addressed to Cook at the 120 West Sherman Street address; marijuana; one hydrocodone pill; empty pill capsules; torn plastic baggies; a digital scale; and a cell phone. In the kitchen, officers searched inside of a bag of cereal and found a "clear tied bag . . . positioned down inside the cereal," and "inside that bag . . . were other little, littler bags that were also tied." (Tr. Vol. 4 at 60). These little bags contained a brown and white rock-like substance, a white rock-like substance, and a light brown and rock-like substance, which were later tested and determined to be a cocaine base and heroin mixture, cocaine, and heroin. In total, officers recovered 5.85 grams of the cocaine base and heroin mixture, 6.42 grams of cocaine, and 9.29 grams of heroin. When officers executed the search warrant of Cook's person, officers found another cell phone and $3,400 in cash.

[8] Sometime later, the JEAN Team sent the cell phone recovered from Cook's person to the Indiana State Police for a forensic exam. The examiner was able to recover a series of text messages between Cook and Brianna Fansler ("Fansler"). Fansler had texted Cook on May 1, 2015, informing him that she needed a gram of heroin "in two halves, like two half gram baggies." (Tr. Vol. 5 at 50). Cook responded by stating that he was at the House and asking if she had money for the drugs. Fansler then requested that Cook deliver the drugs to her, which he did. Four hours later, Fansler texted Cook a second time, requesting more heroin. Cook responded by informing Fansler that he was at the House and requesting that she come to him, which she eventually did. According to Fansler's trial testimony, the House was Cook's "stash house[,]" and that he "hid his dope . . . in cereal boxes and cereal bags." (Tr. Vol. 5 at 56). She further testified that she personally observed Cook hide his heroin inside cereal boxes and cereal bags.

[9] The State charged Cook with Count 1, Level 2 felony dealing in a narcotic drug; Count 2, Level 2 felony dealing in cocaine; Count 3, Level 6 felony maintaining a common nuisance; Count 4, Level 6 felony possession of a narcotic drug; and Count 5, Class A misdemeanor possession of marijuana. The State also alleged that Cook was an habitual offender.

[10] On March 2, 2018, Cook filed a motion to suppress "all the items seized and observations and statements made during, or as a result of, the execution of the search warrant[.]" (App. Vol. 2 at 80). In this motion, Cook argued the search of the House and the search of his person were unconstitutional because the

search warrant: (1) failed to advise the judge of material facts; (2) did not describe with particularity the place and person to be searched; and (3) failed to establish probable cause that a crime had been committed and that evidence of the crime would be found in the House or on Cook's person. At the subsequent suppression hearing in April 2018, Cook argued that, based on the totality of the circumstances, the search warrant issued was invalid because there had been no corroborating evidence to support the issuance of the warrant. After the hearing, the trial court denied Cook's motion to suppress.

[11] In May 2018, this matter proceeded to jury trial, which ended in a mistrial. In September 2018, the State filed a motion to dismiss without prejudice the Level 6 felony maintaining a common nuisance charge, and the trial court granted the motion. Later that month, during his second trial, the jury found Cook guilty of Class A misdemeanor possession of marijuana. However, a second mistrial was declared on the remaining counts. A third mistrial was declared in July 2019.

[12] On August 27, 2019, Cook's fourth jury trial began. The State presented testimony from several Marion Police Department officers, including Detective Sergeants Zigler and Kauffman, a Grant County Sheriff, Jones, Reynolds, Magers, a member of the Indiana State Police cybercrime unit, and Fansler, who all testified to the facts above. In addition, Reynolds testified that Cook had pulled a bag of multiple drugs "as big as a baseball" from his pocket and

had handed them a "point or two" of heroin in exchange for money.[6] (Tr. Vol. 4 at 119-20, 121). When asked on cross-examination whether she told officers on May 1, 2015 that "[she] got the heroin from a tall thin black guy[,]" Reynolds answered in the affirmative. (Tr. Vol. 4 at 125).

[13] The State also introduced testimony from Ashlee Burks ("Burks"), who was the then renter of the House just prior to Cook's occupation of the House in May 2015. Burks testified generally that something had happened to her in the House in November 2014 and that she had moved out of the House the following month. Burks explained that she had prepaid rent through July 2015 and that she had allowed the mother of Cook's child to live in the House. She further testified that in May 2015, the House "was basically just a party house." (Tr. Vol. 4 at 109).

[14] When the State solicited testimony about the drugs found inside the bag of cereal, Cook's counsel did not object. Cook's counsel also did not object when the State introduced photographs of the drugs found inside the bag of cereal. Additionally, when the State introduced the lab report showing that the drugs

---

[6] Detective Sergeant Zigler testified that a point of heroin is "one-tenth of a gram." (Tr. Vol. 4 at 181). Detective Sergeant Kauffman further explained that "a point is normally what someone would use or ingest to get high[]" and that when someone "purchased . . . a point of heroin from a drug dealer, it's one-tenth of a gram so one gram would equal ten points . . . theoretically or ten doses." (Tr. Vol. 4 at 236). As a result, he explained that it is not common for a typical user to have 9.29 grams of heroin in their possession because that would be "90 plus doses." (Tr. Vol. 4 at 236).

found were a mixture of cocaine base and heroin, cocaine, and heroin, Cook's counsel affirmatively stated that he had "[n]o objection." (Tr. Vol. 4 at 232).

[15] At the conclusion of the first day of evidence, Cook filed a second motion to suppress. In this motion, Cook argued that the cell phone and any data obtained therefrom, which had been obtained from a search of his person, should be suppressed because officers impermissibly stopped the Explorer. The trial court found that there was reasonable suspicion to perform the investigatory stop of the Explorer and denied Cook's motion to suppress.

[16] During trial, Cook objected to the admission of the cell phone found on his person and spreadsheets of call logs and text messages. The basis for this objection was Cook's earlier motion to suppress, and Cook's counsel further requested that the trial court "show [his] objection to the phone itself and any data that came off the phone as a continuing objection." (Tr. Vol. 5 at 31). The trial court noted the continuing objection and admitted the evidence over Cook's objection. Cook also objected to Fansler's testimony regarding the content of the text message communications on May 1, 2015, and the trial court overruled the objection. Thereafter, the jury found Cook guilty of Level 2 felony dealing in a narcotic drug, Level 2 felony dealing in cocaine, and Level 6 felony possession of a narcotic drug. Cook admitted that he was an habitual offender.

[17] At the subsequent sentencing hearing, the trial court imposed a thirty (30) year sentence for the Level 2 felony dealing in a narcotic drug conviction and

enhanced the sentence by ten (10) years for the habitual offender adjudication. The trial court also imposed executed terms of thirty (30) years for the Level 2 felony dealing in cocaine conviction, two and one-half (2½) years for the Level 6 felony possession of a narcotic drug conviction, and one (1) year for the Class A misdemeanor possession of marijuana conviction. All of the sentences were ordered to run concurrently for an aggregate executed sentence of forty (40) years. Cook now appeals.

# Decision

[18] On appeal, Cook argues that: (1) the trial court abused its discretion by admitting evidence; and (2) the State presented insufficient evidence to support his two dealing convictions. We address each of his contentions in turn.

## 1. Admission of Evidence

[19] Cook argues that the trial court abused its discretion by admitting: (A) drug evidence seized from the House during execution of the search warrant; and (B) information obtained from his cell phone, which had been obtained following a search of his person during an investigative stop. Specifically, he contends that the evidence seized from the House was inadmissible because the search warrant lacked probable cause and that the information obtained from his cell phone is inadmissible because the investigative stop was unlawful.

[20] Although Cook filed motions to suppress, he is appealing following a completed trial. "'A trial court has broad discretion in ruling on the

admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion.'" *Halliburton v. State*, 1 N.E.3d 670, 675 (Ind. 2013) (quoting *Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011)). "'An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it.'" *Id*. (quoting *Turner*, 953 N.E.2d at 1045).

## A. Drug Evidence from the House

[21] We first address Cook's challenge to the admissibility of the drugs seized from the House during execution of the search warrant. Cook argues that the trial court abused its discretion by admitting the evidence from the House because the search warrant lacked probable cause. Cook, however, has waived appellate review of his argument because he failed to object to the admission of any of the evidence seized from the House when introduced at trial. It is well established that "[a] contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal[.]" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010), *reh'g denied*.

[22] Here, the record reveals that when the State moved to admit the drugs seized from the House, Cook failed to object. For example, when the State introduced photographs of the drugs found inside the bag of cereal, Cook's counsel did not object. When the State introduced the lab report confirming that the drugs found were a mixture of cocaine base and heroin, cocaine, and heroin, Cook's counsel affirmatively stated that he had "[n]o objection." (Tr. Vol. 4 at 232).

An "'appellant cannot on the one hand state at trial that he has no objection to the admission of evidence and thereafter in this Court claim such admission to be erroneous.'" *Halliburton*, 1 N.E.3d at 679 (quoting *Harrison v. State*, 281 N.E.2d 98, 100 (Ind. 1972)). As a result, Cook's failure to object results in waiver of appellate review.

[23] Nevertheless, "[a] claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Brown*, 929 N.E.2d at 207. "The fundamental error exception is 'extremely narrow[] and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Id*. (quoting *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)). As our supreme court explained in *Brown*, a showing of fundamental error arising from the admission of alleged illegally seized evidence is very limited:

> [A]n error in ruling on a motion to exclude improperly seized evidence is not per se fundamental error. Indeed, because improperly seized evidence is frequently highly relevant, its admission ordinarily does not cause us to question guilt. That is the case here. The only basis for questioning Brown's conviction lies not in doubt as to whether Brown committed these crimes, but rather in a challenge to the integrity of the judicial process. We do not consider that admission of unlawfully seized evidence ipso facto requires reversal. Here, there is no claim of fabrication of evidence or willful malfeasance on the part of the investigating officers and no contention that the evidence is not what it appears to be. In short, the claimed error does not rise to the level of fundamental error.

*Brown*, 929 N.E.2d at 207.

Just as in *Brown*, Cook does not claim that there was fabrication of the evidence or willful malfeasance on the part of members of the JEAN Team, and he does not contend that the evidence is not what it appears to be. Significantly, Cook has failed to acknowledge his lack of objection during trial and does not argue that the admission of the evidence constituted fundamental error. Rather, Cook asserts that the evidence at issue seized from the House pursuant to the search warrant should not have been admitted because the information provided by Jones and Reynolds was uncorroborated hearsay. Because Cook failed to object to the admission of the evidence at trial, does not assert fundamental error on appeal, and has failed to raise any grounds to support a finding of fundamental error, we decline to review his evidentiary challenge. *See*, *e.g.*, *id.* at 208 (explaining that it is not necessary to resolve the issue of whether a search was lawful where the defendant had failed to preserve the issue by failing to object and where there was no fundamental error).

## B. Cell Phone Evidence

Cook next argues that the trial court abused its discretion by admitting evidence obtained from his cell phone. Cook contends that that "evidence obtained during the stop and seizure of Cook" was unlawful "because there was no independent suspicion of a crime having been committed[.]" (Cook's Br. 9).

It is well settled that reasonable suspicion to justify an investigative stop must be based on specific and articulable facts known to the officer at the time of the

stop that leads the officer to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion requires more than mere hunches or unparticularized suspicions. *Id*. at 27. An officer must "be able to articulate some facts that provide a particularized and objective basis" for believing a crime has occurred or is afoot. *Marshall v. State*, 117 N.E.3d 1254, 1259 (Ind. 2019). The reasonable suspicion inquiry is highly fact-sensitive and is reviewed under a sufficiency of the evidence standard. *Finger v. State*, 799 N.E.2d 528, 533 (Ind. 2003). Like any matter of sufficiency of the evidence, "'[t]he record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling.'" *Id*. (quoting *Goodner v. State*, 714 N.E.2d 638, 641 (Ind. 1999) (citations omitted)).

[27] At the outset, we note that the seizure of Cook's cell phone was based on the search warrant obtained by Detective Sergeant Zigler and not the product of the stop of the Explorer. Indeed, the testimony reveals that officers did not search or seize Cook's cell phone until after the search warrant had been issued. Moving to the stop of the Explorer, members of the JEAN Team, who were surveilling the House for illegal drug activity, observed Jones and Reynolds exit the House. The women, who appeared to be under the influence of a narcotic drug, were stopped, and they explained that they "had just used and got heroin from an individual inside the [House]." (Tr. Vol. 4 at 221). Reynolds trial testimony indicated that she had described the individual that evening as a tall thin black guy and that he had pulled a baseball-sized bag of drugs from his

pocket. Soon thereafter, members of the JEAN Team observed two males exit the House and enter the Explorer. One male entered the driver's seat, and the other male, who Detective Sergeant Kauffman recognized as Cook, entered the passenger seat. After an officer stopped the Explorer and detained the occupants, Detective Sergeant Kauffman confirmed that the passenger was Cook, who also matched the description of the individual who had provided Jones and Reynolds with heroin. At this point, Detective Sergeant Kauffman relayed this information to Detective Sergeant Zigler, who added Cook to the search warrant. After the search warrant was granted, Cook was transported and searched at the jail, yielding his cell phone.

[28] We conclude that there was reasonable suspicion to stop Cook. Cook's argument to the contrary ignores the axiom that "an investigative stop may be based upon the collective information known to the law enforcement organization as a whole." *State v. Glass*, 769 N.E.2d 639, 643 (Ind. Ct. App. 2002), *trans. denied*. As described above, Detective Sergeant Kauffman observed Cook leave the House after a reported drug deal. Additionally, there was reasonable suspicion to believe that Cook, who matched the description given by Reynolds, was the same individual who had supplied Jones and Reynolds with heroin. "[A]n officer may make a *Terry* stop of a vehicle to investigate an offense other than a traffic violation, as long as the officer has reasonable, articulable suspicion that a crime is being or has been committed." *State v. Campbell*, 905 N.E.2d 51, 55 (Ind. Ct. App. 2009), *trans. denied.* Indeed, "[l]aw enforcement was only required to have a "reasonable suspicion" to stop Cook,

not "absolute certainty" that Cook was involved in illegal activity. *See Rutledge v. State*, 28 N.E.3d 281, 290 (Ind. Ct. App. 2015) (explaining that "*Terry* does not require absolute certainty of illegal activity"). Accordingly, we conclude that the trial court did not abuse its discretion by admitting the evidence obtained from Cook's cell phone.

## 2. Sufficiency of Evidence

[29] Lastly, Cooks challenges the evidence supporting his Level 2 felony dealing in a narcotic drug and Level 2 felony dealing in cocaine convictions. Our standard of review for sufficiency of evidence claims is well settled. "When reviewing the sufficiency of the evidence to support a conviction, 'appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict.'" *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (quoting *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)) (emphasis added in *Drane*). Reviewing courts should not "assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Drane*, 867 N.E.2d at 146. Indeed, it is our duty to "affirm the conviction unless 'no reasonable fact-finder could find the element of the crime proven beyond a reasonable doubt.'" *Id*. at 146-147 (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[30] To convict Cook of Level 2 felony dealing in a narcotic drug, the State was required to prove that Cook "knowingly possess[ed] with the intent to deliver a narcotic drug and the amount of the drug involved [was] at least ten (10)

grams[.]" (App. Vol. 2 at 14). Similarly, to convict him of Level 2 felony dealing in cocaine, the State was required to prove that Cook "knowingly possess[ed] with the intent to deliver cocaine and the amount of the drug involved [was] at least ten (10) grams[.]" (App. Vol. 2 at 15).

[31] Cook generally argues that the evidence was insufficient to support his two dealing convictions, and he makes no separate argument for each conviction. Because he makes no cogent argument and provides no caselaw to support his contention, he has waived his sufficiency argument. *See* Ind. Appellate Rule 46(A)(8)(a).

[32] Waiver notwithstanding, the evidence was sufficient to support Cook's two dealing convictions. Both of Cook's dealings convictions were based on possession of heroin and cocaine with the intent to deliver. Cook challenges whether he possessed the two drugs at issue, arguing that there was "no evidence tying [him] to the drugs[]" found at the House. (Cook's Br. 17).

[33] Here, the State showed that Cook had actual possession of heroin and constructive possession of cocaine and the cocaine base and heroin mixture. A conviction for a possessory offense does not depend on catching a defendant red-handed. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). Indeed, a conviction for possession of contraband may be based on evidence of actual or constructive possession. *Griffin v. State*, 945 N.E.2d 781, 783 (Ind. Ct. App. 2011). The two differ in that actual possession occurs when a defendant has direct physical control over an item, whereas constructive possession occurs

when the defendant has the intent and capability to maintain dominion and control over the item. *Id*.

[34] First, the evidence shows that Cook had actual possession of heroin. Fansler bought heroin from Cook at the House and observed him with heroin during this purchase. Additionally, Reynolds explained that when she received the heroin from Cook, he had pulled it out of his pocket.

[35] Moreover, there was evidence that Cook constructively possessed the cocaine and cocaine base and heroin mixture. Again, constructive possession occurs when the defendant has the intent and capability to maintain dominion and control over the item. *Griffin*, 945 N.E.2d at 783. To prove the "intent" element of constructive possession, the State must demonstrate the defendant's knowledge of the presence of the contraband. *Armour v. State*, 762 N.E.2d 208, 216 (Ind. Ct. App. 2002), *trans. denied*. When, as is the case here, a defendant's possession of the premises on which drugs are found is not exclusive, then the inference of intent to maintain dominion and control over the drugs must be supported by evidence of additional circumstances. *Gray*, 957 N.E.2d at 174-75. Examples of these additional circumstances include a defendant's incriminating statements, a defendant's attempting to leave or making furtive gestures, the location of contraband like drugs in a setting suggesting manufacturing, the item's proximity to the defendant, the location of contraband within the defendant's plain view, and the mingling of contraband with other items owned by the defendant. *Id*. at 175.

[36] To prove the second element of constructive possession, a trier of fact may infer that a defendant had the capability to maintain dominion and control over contraband from the simple fact that the defendant had a possessory interest in the premises on which an officer found the item. *Id*. at 174. This inference is allowed even when the possessory interest is not exclusive. *Id*.

[37] Here, with regard to the intent element of constructive possession, there was evidence of "additional circumstances" exhibiting Cook's knowledge of the presence of the cocaine and cocaine base and heroin mixture in the House. First, there was evidence that the house was a drug manufacturing setting. The JEAN Team discovered a digital scale, plastic baggies, empty pill capsules, and other drug paraphernalia. Also, officers located a letter addressed to Cook at the House address on the coffee table.

[38] Regarding Cook's capability to maintain dominion and control over the contraband found at the House, officers observed Cook leaving the House. The State also presented evidence that Cook had used the House as his "stash house." (Tr. Vol. 5 at 53). Thus, there was evidence that Cook had a possessory interest in the house where the contraband was found, which is sufficient to show that he had the capability to maintain dominion and control over the contraband. *See Gee v. State*, 810 N.E.2d 338, 341 (Ind. 2004) (noting that a defendant may be found to be in control of drugs discovered in a house whether he is the owner, a tenant, or merely an invitee).

[39] Cook's argument is largely a request for us to reweigh the evidence, which we cannot do. *See Drane*, 867 N.E.2d at 146. Our role is not to consider other reasonable inferences that could have been drawn from the evidence. *See id*. Rather, we consider "only the probative evidence and reasonable inferences supporting the [conviction]." *Id*. Based on the foregoing, we conclude that the jury, as the trier of fact, could have reasonably determined that Cook possessed both heroin and cocaine with the intent to deliver them. Accordingly, we affirm Cook's convictions for Level 2 felony dealing in a narcotic drug and Level 2 felony dealing in cocaine.

[40] Affirmed.

Bradford, C.J., and Baker, Sr.J., concur.